# Hannah *against* Swarner.

J. S., by his will, devised his real estate to his executors to be sold, and the proceeds thereof to be divided among his children, two of whom were married women. The legatees, together with the husbands of those who were married, entered into a written agreement that the land should not be sold, but " that each heir and devisee to hold land in proportion to the sum bequeathed them," and allotting to each legatee, by name, a particular part of the land. *Held*, that this was an election to take land instead of money, by which the fee-simple was vested in the legatee and not in her husband.

ERROR to the Common Pleas of *Perry* county.

Sarah Hannah against William Swarner.  Ejectment.

On the 6th of April 1815, Joseph Smith died, having first, on the 6th of March 1815, made his last will and testament, by which he directed his executor to sell all his estate, real and personal, and out of the purchase money to pay certain legacies to his five children, and one grand-child.  On the 5th of October 1818, the legatees under the will entered into an agreement to divide the real estate of the deceased among themselves, in parts proportioned to the amount of the legacies bequeathed to them by the will.  After this agreement was executed, the parties to it ascertained that the part allotted to John Smith, Sarah Hannah, and Jesse Miller, was of the value of $66.67, as of the 1st of April 1832, more than the part allotted to Elizabeth, Mary, and Joseph, and for this sum, $66.67, John Smith, John Hannah, and Jesse Miller gave a note to Joseph Smith, Elizabeth Smith, and John White.  On the 3d of May 1820, the executors named in the will, executed a deed of conveyance to John Smith, John Hannah, and Jesse Miller for the part of the land allotted to them, by the agreement for the respective undivided parts in the allotment, proportioned to the amount of their several legacies under the will.  This deed, in point of fact, was delivered to Jesse Miller, and remained in his possession, and whether the execution and delivery thereof was assented to or not, by John Hannah and his wife, or either of them, and whether this amounted to a delivery of the deed and transfer of the estate to John Hannah, so as to devest the estate of his wife, see parol evidence.

On the 1st of April 1819, Hannah and wife went into the occupation of the part allotted to the last three mentioned legatees, and continued to occupy it undivided, until the 27th of May 1825, when Jesse Miller, having previously become the owner, by purchase of John Smith's undivided interest, John Hannah and Sarah his wife executed a release to Jesse Miller for 66 acres of the said land, as his full part and interest, and each of the parties went into the exclusive possession of their own parts.  On the 10th of August 1824, a suit was brought before a justice on the note of John Smith, John Hannah, and Jesse Miller, before mentioned, by Joseph Smith, Joseph Bonner, intermarried with Elizabeth Smith, and John White, and upon the final hearing of the case before the justice, it appeared that John Smith and Jesse Miller had paid their proportions of the said note, and a judgment was rendered in their favour, and against John Hannah, for $28.05.  For this sum an execution was issued against Hannah, upon which the constable made from Hannah a part of the money, leaving a balance of the said judgment unpaid of $14.10.  A transcript of this judgment was filed in the Common Pleas the 10th of September 1825, upon which a *fieri facias* issued to August term 1827, upon which a levy was made on the 25 acres,

[Hannah v. Swarner.]

94 perches aforesaid, as the property of John Hannah, which was condemned; and upon a *venditioni exponas* to August term 1828, the land was sold to Thomas D. Gordon for $185.00, who obtained the sheriff's deed therefor, dated 5th of November 1828. Thomas D. Gordon proceeded against Hannah, upon his sheriff's title, before two justices of the peace, in pursuance of the Act of Assembly, and dispossessed him of the said land, and afterwards, on the 30th of April 1833, conveyed the same to the present defendant, who had then notice of Mrs Hannah's title, and took a bond of indemnity against it. John Hannah died on the 11th of May 1837, leaving Sarah Hannah surviving him, who was the plaintiff in this suit.

The question turned principally upon the construction of the following agreement between all the legatees of Joseph Smith, deceased, and the husbands of those who were married:—

"5th of October 1818. Whereas, Joseph Smith, deceased, did make his last will and testament, dated the sixth day of March 1815; and in said last will and testament, he did order and direct that his executors therein named, should sell and dispose of all his property, real and personal, as soon as convenient after his decease; and after discharging his funeral expenses and just debts, the residue of the money arising from the sale of said property, to be divided among the following heirs and devisees, viz: John Smith, Mary White, (intermarried with John White,) Elizabeth Smith, Sarah Hannah, (intermarried with John Hannah,) Joseph Smith, and Jesse Miller, to be paid in such proportion as will appear in said will. Now, whereas said real property, which consists of two certain plantations, (situated in Raccoon Valley, one of which lies between the ridge and mountain, and the other lies down in the valley, in the township, county, and place aforesaid,) cannot be sold at this time to good advantage for us. This indenture witnesseth, that we do agree to have it divided amongst us in the following manner, to wit: Valuing the land at $25 per acre. Then each heir and devisee to hold land in proportion to the sum bequeathed them by said testator. The old plantation on which said testator resided at the time of his death, to be divided by having a line run through said plantation, up and down the valley, on the north side of the great road, which runs through it, then on the side next the Raccoon creek, viz: On the south side of said line is to be the shares of Elizabeth Smith, Mary White, and Joseph Smith; and on the side next Tuscarora mountain, viz: The north side of said line, is to be the shares of John Smith, *Sarah Hannah*, and Jesse Miller. Then, after considering the value of the improvements, and quality of the land on each side of said line, if it is found that the one division is worth more than the other, the parties must adjust the difference by paying back to one another until they are equal. Also, there is a stream of water runs through the north division, and without some use of it,

III. — 29

the south division would be considerably undervalued.   There-
fore, the party who will hold the north side, will bind themselves
in a penalty of $1000 to let the owners of the south side have the
privilege of taking water out of said stream, as has been formerly
done.   And as for the ridge plantation already mentioned, it shall
be divided as may be agreed on, when such division actually takes
place, which is to be as soon as time will admit of.   And lastly,
we do each of us agree to pay our respective shares of the costs
of getting said divisions made, to give and render any satisfaction
in our power, in law or equity, one to another, or to executors,
in order to get the title of said land vested in us, and to exonerate
said executors of the injunctions laid on them, and for the true
performance of all and singular the covenants and agreements
aforesaid, we do bind ourselves, one unto another, in the penal
sum of $1000, firmly by these presents.   In witness whereof," &c.

The defendant then gave in evidence a deed, dated 3d of May
1820, from the executors of Jos. Smith, deceased, to John Smith,
John Hannah, and Jesse Miller, for that part of the land which
had been allotted to them by the agreement of the 5th of October
1818.   He also gave in evidence a release of John Hannah and
Sarah his wife, to Jesse Miller, for a part of the land, his share
and that of John Smith, which he had purchased, and which re-
lease was given in pursuance of an amicable partition made be-
tween them, and recited the foregoing deed from the executors.
On the subject of this deed and release, and the agreement entered
into between the legatees, the following evidence was given :

Jesse Miller, Esq.   I was the person who wrote the article of
agreement amongst the legatees, and was, as well on account of
my own interest, as by what I believe was the desire of the others
concerned, an active agent in trying to have the object of the
agreement carried into effect.   I was present at the surveying of
the land, and was engaged in making all the calculations connected
with the whole transaction.   I wrote the deed of the executors of
Joseph Smith, deceased, to John Smith, John Hannah, and myself,
and attended to getting it executed and acknowledged by the
executors.   The manner in which the title was to be perfected or
vested in the legatees, I am satisfied was the subject of general
conversation amongst all concerned, and was no doubt understood
so far as they were capable of comprehending it.   To me, the
mode of vesting the title to that part allotted to John Smith, John
Hannah, and myself, was plain, to wit: — By a deed from the
executors to us; neither of us being executors.   I believe such a
deed was necessary to give us title, and that it was in accordance
with the intentions of the parties as expressed in the agreement;
and as I have before stated, wrote it and had it executed; and
after I became the owner of John Smith's interest, had a division
made between Hannah and myself, and procured a release for my
part, from him and his wife.

[Hannah v. Swarner.]

In regard to whether John Hannah or his wife assented to the execution of the deed of the executors to John Smith, Hannah, and myself, I can say nothing *positive* or *specific,* either *affirmatively* or *negatively.* I can have no doubt, from the conversations I frequently had with them on the subject, that we talked about having the deed executed, but whether I showed it to them, either before or after its execution, I cannot now undertake to say. I cannot say whether the deed was delivered to me at the time of its execution, or some time afterwards. I believe it was executed at Francis M'Gowen's house and acknowledged before him: whether it was there handed to me or retained by the executors and given to me some time afterwards, I cannot tell. I had it, however, afterwards in my possession, and gave it to the purchaser when I sold my share of the land. There was some talk about a refunding bond and release from John Smith, Hannah, and myself, to the executors. I think a release was written, but whether it was ever executed I cannot say. I do not believe any bond was ever executed. Hannah and his wife was almost wholly ignorant of the manner of transacting such business; and the greatest portion of the other legatees had but little knowledge of it; hence I had the direction of it left very much to myself. I had frequent conversations with Sarah Hannah, in regard to her rights in the property. I cannot fix these dates, but believe they were principally, if not all, after the execution of the deed. She always insisted that the land was hers, and that it could not be taken from her for her husband's debts. I always told her I was of a different opinion; that I believed it could be sold for his debts, and advised her that they should sell it before it would be encumbered with liens, and to get the proceeds invested in some way to secure their benefit to herself; but she always refused to yield to any such advice, and resolutely persevered in the opinion that she never could be ejected from the possession of the land. I cannot now undertake to say whether I had any idea at the time I wrote the deed, that its execution would change or affect her rights in the property, so as in the one case to subject it to a sale in fee for his debts, while in the other, nothing but a life estate could be sold. I presume, however, I did not advert to it, or think of it at the time. In giving her the advice I did afterwards, I am confident I then had in view the fact, as I believe it to be, that the title was vested by the deed in her husband, and have no doubt so explained it. My belief is that the agreement contemplated the execution of such a deed; and that its execution was acquiesced in, if not expressly assented to by Hannah and his wife. It seemed to me to be the only mode of consummating the agreement, and getting a legal title vested in the legatees; but at the same time I feel confident, that if Sarah Hannah had known her rights in the land would have been in any degree lessened or impaired by it, she would have objected to it. In making this statement, I have

[Hannah v. Swarner.]

endeavoured to present all the facts and circumstances that I could bring to my recollection, having a bearing on the case. I have no doubt stated many things that may be irrelevant, and may have forgotten others of more importance. In what I have stated, I may not be literally correct, but believe I am so substantially. My recollection about the release and refunding bond I have mentioned, is very imperfect, and not to be relied on. If any such papers were executed at any time, I presume they were delivered to Joseph Smith, one of the executors.

I perhaps ought also to state, that some of the executors may have probably shown Hannah and wife the deed, but I do not know that they did.

Mrs Bonner, affirmed. I was executrix of Mr Smith; I was present when the deed read was made, it was at Esqr. M'Gowen's—I can't positively say that Jno. Hannah was there: when I was first asked about it by Mr Leonard, I could not recollect—he said he still thought he was there, I could not say for certain; I thought may be the deed could not be made unless they were present—I can't recollect whether John Hannah was there or not—I cannot say positively he was there, I cannot recollect, can't mind. I cannot recollect that he was not there.

The two executors, myself and Miller, were at M'Gowen's; Mrs Hannah was not there. I don't recollect John Hannah being there. I can't say positively that any more were present than I have mentioned. To the best of my knowledge all parties knew of this deed, and were satisfied with it. I was acquainted some with John Hannah; was a neighbour to him; no conversation between John Hannah and me in relation to this deed; don't recollect any conversation with J. Hannah about the land.

John White sworn. I am a brother-in-law of John Hannah; live on opposite side of place from him. I don't know of Hannah being there when deed was made. He lived on the land. I think John Hannah knew of the deed. I heard John Hannah say they had got a deed. He was in possession of the land. He had 28 acres of it, I think. He gave it out to work to one and another. Think he did not claim any more than the 28 acres. He did not die on the land.

He was in under the article too; we talked about both the article and deed. We talked about the deed, and I know he had the article. They were all in an article, and he had his share on that article. I don't know where that deed was; I never saw it; don't know that John Hannah ever saw it. Hannah and wife did not live on that land before the article. He came there the spring after they divided. I left the house and they came into it. The division into two parts, and the article, were made about the same time, and Hannah and his wife went on the land the spring after they divided into two parts. John Hannah, Jesse Miller, and Smith made a divide of their parts some time after Hannah moved

[Hannah v. Swarner.]

there. Hannah said John Smith wanted to get clear of the divide like; and Hannah said they had got a deed, and he guessed he could not do it, that he was fast there.

Admitted that at the time Swarner purchased from Gordon, he took a bond of indemnity to protect him against any claim Mrs Hannah had to this land.

The plaintiff requested the court to charge the jury upon the following points:

1. Unless there was a delivery of the deed to John Hannah or to Jesse Miller, for his use, there was no estate vested in him greater than a life estate. If, therefore, the jury believe that John Hannah was dead at the time this suit was brought, the plaintiff is entitled to recover.

2. That it was competent in law for the legatees under the will of Joseph Smith to elect to take the land instead of the proceeds of the sale of it: that the agreement of the 5th of October 1818, was such an election, and vested the estate in fee in the legatees named in the will. And if the jury believe that Jesse Miller afterwards, on the 3d of May 1820, procured a deed to be made to John Smith, John Hannah, and himself, under the belief that it was necessary, either with or without the assent or knowledge of John Hannah, such deed will not devest the estate of Sarah Hannah, to which she was entitled on the death of her husband.

The defendant requested the court to charge the jury on the following points:

1. That by the will of Joseph Smith, John Hannah and his wife were entitled to a money legacy and not land; and that John Hannah had a right to secure the legacy to his own use, and to give an acquittance for the same to the executors for it. If, instead of money, by the arrangement of the parties, they elect to take land, and the executors executed and delivered the deed to the grantees, John Hannah agreeing to pay the difference between the value of that granted to him, and the amount he was entitled to receive—if he was in possession under the deed—and a part of the sum so stipulated to be paid by him, was collected by exetion, and the land sold at sheriff's sale for the residue, and by several mesne conveyances the title so purchased has passed to the present defendant, the plaintiff in this suit cannot recover.

2. If, in pursuance of the arrangement between the parties, in electing to take land instead of money, the deed was delivered by the grantors to Jesse Miller for himself and the other grantees, and John Hannah assented to the deed and claimed under it, and held possession of the 28 acres set apart for him on the grant, such facts would constitute a good and valid delivery of the deed to John Hannah—and more particularly so, under the operation of the release of John Hannah and wife, to Jesse Miller, dated the 27th of May 1825, and the recitals therein.

The court answered the plaintiff's points in the negative, and

III. — U

those of the defendant in the affirmative.    Verdict and judgment for defendant.

*Watts*, for plaintiff in error.    Under the will of the testator it was competent for the legatees to elect to take land instead of money.    1 *Whart.* 264; 3 *Wheat.* 578; 2 *Story Eq.* 101, sect. 793. By the agreement of the 5th of October 1818, they made that election.    Sarah Hannah, the wife, was the legatee, and at that period it was competent for the husband to exercise his right, and to claim the money or the land; but it was equally competent for him to pursue the more meritorious course of making that election in favour of his wife.    The question then arises, what did he do? and this involves the construction of the agreement; by which the plaintiff says, the intention of the parties is clearly and distinctly expressed, that the estate in the land shall be vested in the legatee—" the north side of said line is to be the shares of John Smith, *Sarah Hannah*, and Jesse Miller."    Even if the construction of this agreement were doubtful, upon clear legal principles, that doubt will be determined for the protection of the wife's interest. 16 *Serg. & Rawle* 30; 11 *Serg. & Rawle* 325.    A wife's right will never be defeated by a constructive claim of the husband.    2 *Serg. & Rawle* 493; 4 *Rawle* 182; 2 *Watts* 90; 4 *Whart.* 179.

What, then, has the deed of the 3d of May 1820, to do with the rights of the parties?    The trust committed to the executors had failed, or was extinguished by the consent of all the parties interested in the execution of it.    The estate which had vested in the executors by the will had already been devested by the election of the legatees.    What had they then to convey?    This deed was an absolute nullity.    5 *Rawle* 140.

*Reed, contra.*    Upon the death of the testator, his real estate having been devised to be sold, shall be considered as money; 5 *Law Lib.* 2, 3, 65, 91; and the husband was, therefore, as well entitled to receive the legacy to his wife as if it had been given to himself. If then there was an agreement to take land instead of money, the land would go to him, who alone had power to make the election or give any release to the executors from the execution of the trust which had been committed to them by the will.    2 *Atk.* 452; 1 *Meriv.* 296; 1 *Eq. Cas. Ab.* 395; 8 *Watts* 252.    The effect and purport of the agreement of 1818 was merely to make the election, and that agreement was consummated—the intention of the parties was expressed—the contract was executed by the deed of 1820, and the previous agreement was merged in it.    1 *Rawle* 377; 1 *Watts & Serg.* 83, 443.

The opinion of the Court was delivered by

ROGERS, J.—The testator having directed his land to be sold, it must be considered as money.    Equity considers land directed

[Hannah v. Swarner.]

in wills or other instruments to be sold and converted into money as money, and money directed to be employed in the purchase of land as land. So land impressed with the character of money must remain so impressed, until some person elects to take it in its original character as land. 3 *Whart.* 65; 1 *Meriv.* 300. In the case before us, although the wife was not capable of changing the nature of the estate, because of coverture, and unable, therefore, to contract, there was nothing to prevent her husband, in whom the right of electing undoubtedly is, from electing to take it as land. *Oldham* v. *Hughes,* (2 *Atk.* 452). The article of agreement of the 5th of October 1818, signed by all the heirs and devisees, among whom are John Hannah and wife, amounts to an election to reconvert the land from money to land. The question as to the effect of the election. On one side, it is said, that the husband elects for himself, and that he acquires a fee simple in the property; whilst it is contended he elects for his wife, and that she has the fee simple, subject only to his marital rights. Whether the land is a new acquisition, or whether the wife takes the property *ex parte paterna,* is immaterial, and we consider the case as a question of intention. It cannot be doubted that the husband, by whose act the money is reconverted into land, may by an express determination on his part, avoid any legal consequences by considering the fund so reconverted as his own property, as for example, by taking a deed or conveyance of the property to himself, or by evincing his intention by some other unequivocal act or declaration. It is also equally plain, that as the property was derived by and through the wife, the husband may order or permit a conveyance or deed to be made to her, or may assent to her having the property in the same manner, and hold the estate as if devised to her by the testator as land. But suppose the husband elects to take the legacy as land without more? In that case, it is argued, that as the husband is entitled to the legacy, which he may recover by suit, or may sell, or otherwise dispose of and reduce into possession by an election simply, the land is his in the same manner as the legacy was his. And this argument would be incontrovertible, if the husband had an absolute right to the money by virtue of the bequest; but until some act of the husband, the wife still retains an interest in it, and upon the death of the husband it survives to her. Recently a disposition has existed in the courts, and in the legislature, to restrain, as far as may be, the power of the husband over the estate of the wife—to take nothing by implication against her; and when the intention is doubtful, to incline most strongly in favour of her rights. But how far this disposition would control the case supposed, it is not absolutely necessary now to determine, as the case will be put on the special circumstances and words of the article itself. As before said, the heirs and devisees of the testator, by an article of agreement of the 5th of October 1818, agreed to reconvert the money into land.

In that agreement, as he had an undoubted right to do, John Hannah, the husband, agrees that it shall be the land of the wife. After reciting the terms of the devise, and describing the real estate, &c., they agree to have it divided among them in the following manner, to wit: "Valuing the land at $25 per acre. Then each *heir and devisee* to hold land in proportion to the sum bequeathed them by the testator. The old plantation, on which the testator resided at the time of his death, to be divided by having a line run through said plantation, up and down the valley, on the north side of the great road, which runs through it; then, on the side next the Raccoon creek, viz: on the south side of the said line, is to be the shares of Elizabeth Smith, Mary White, and Joseph Smith; and on the side next the Tuscarora mountain, viz: the north side of said line, is to be the shares of John Smith, Sarah Hannah, and Jesse Miller." It must be remarked, that in no part of the will is John Hannah mentioned as either heir or devisee; his name only occurs as the husband of the daughter and devisee, Sarah. So that the words "heir and devisee," in the article, apply to her and not to him. In the article, where it is said what is to be taken, and who is to take, it is to be the share of Sarah and not of her husband. In the construction of the agreement, therefore, without doing any violence to the language used, we may fairly infer an assent by John Hannah that his wife should be entitled to her legacy in land, which would of course vest a fee simple in her, subject to his right as tenant, by the curtesy. Under all the circumstances, a Court of Chancery would direct a conveyance to the wife; but equity, and particularly in this state, where we have no Court of Chancery, considers that as done which ought to have been done. In determining this cause, we must consider the rights of the parties on the execution of the articles by which the husband elected to take the money as land. If by this act a fee, as we think, was vested in the wife, the deed by the executors cannot affect it, for her interest in land can only be devested by time, or in the mode prescribed by the Act enabling husband and wife to dispose of her estate. There is nothing in the argument that the defendant is a purchaser for a valuable consideration without notice. He acquired by his purchase at the sheriff's sale the title of John Hannah only. He was bound to ascertain his interest, as it *depended on* the will and the subsequent agreement to elect to take the legacy as land.

Judgment reversed, and *venire de novo* awarded.